[No. G022801. Fourth Dist., Div. Three. Nov. 2, 2000.]

EVA NEUFELD, Plaintiff and Appellant, v.
BALBOA INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Law Offices of George Baltaxe and George Baltaxe for Plaintiff and Appellant.

Cummins & White, Larry Arnold and Annabelle M. Harris for Defendant and Respondent.

## OPINION

**SILLS, P. J.**—Eva Neufeld made a claim in April 1995 to Balboa Insurance Company for the losses incurred when the roof of her ski lodge collapsed. Balboa denied the claim in June 1995 on the ground that the cause of the losses, the weight of snow on the roof, was not a named peril under Balboa's named peril policy. (The policy provided for narrower coverage than usual because it had been procured for Neufeld by her lender.) Neufeld requested reconsideration on the theory that the cause of the loss was vandalism, which was a named peril. Balboa rejected that contention in October 1995. Neufeld filed this lawsuit in March 1997 and Balboa successfully moved for summary judgment on the policy's contractual one-year statute of limitations (often called the "one-year suit provision"). Neufeld

then appealed, arguing that a copy of the policy sent to her ex-husband did not contain the standard one-year suit provision.[1]

In the interim, the Court of Appeal decided *Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260 [84 Cal.Rptr.2d 552] (*Spray, Gould*), which, in combination with the regulations of the Insurance Commissioner on which the opinion relies, has pretty much vitiated the one-year suit provision as a defense in first party insurance cases. Specifically, *Spray, Gould* held that an insurer could be estopped from raising the one-year suit provision as a defense if it had not complied with regulations issued by the California Insurance Commission in 1992 requiring every insurer to disclose to a first party claimant all time limits that might apply to the claim presented by the claimant. (See *id.* at pp. 1264 [citing Cal. Reg. Notice Register 92, No. 52 (Dec. 15, 1992)], 1265, fn. 3 [quoting Cal. Code Regs., tit. 10, § 2695.4, subd. (a)].)[2] The basic theory of the *Spray, Gould* decision is that "after-the-fact" administrative sanctions do nothing to "rectify" the wrong the disclosure regulation was "designed to prevent," and it is therefore up to the courts, "through their equitable powers," to "require compliance" with the regulation. (*Spray, Gould, supra,* 71 Cal.App.4th at p. 1271.) Otherwise, insurers would have a de facto incentive to disregard the regulation. (*Ibid.*) Scofflaw insurers would gain a "competitive edge" on those who complied. (*Id.* at p. 1274.)

In the present case we have found nothing in the record to suggest that Balboa had notified Neufeld of the one-year suit provision, and there is a declaration from Neufeld's attorney that none of his correspondence with the company mentioned the one-year suit provision. We therefore requested supplemental briefing on the question of whether any violation of the disclosure regulation might estop Balboa from raising the one-year suit

---

[1]Which is a highly counterintuitive argument to make in the context of a stripped-down policy such as the one here: The one-year suit provision is part of the standard provisions required by statute in the standard form fire insurance policy (see Ins. Code, §§ 2070 [requiring all fire policies to be on the standard form], 2071 [standard form itself]). While another statute, Insurance Code section 2079, subdivision (e), states that a clause "may be added to the standard form," that "waiv[es] any of the requirements imposed on the insured after loss," that statute does not provide for the *omission* of the provisions in the standard form.

The dynamics and history of the standard form and the one-year suit provision are set out in *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 682-684 [274 Cal.Rptr. 387, 798 P.2d 1230].

[2]California Code of Regulations, title 10, section 2695.4, subdivision (a) provides in part: "Every insurer shall disclose to a first party claimant or beneficiary, all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant." As *Spray, Gould* indicates, the time limits requirement has been in the regulation since prior to its one amendment in 1997. (See *Spray, Gould, supra,* 71 Cal.App.4th at p. 1264, fn. 2.)

provision defense. (See Gov. Code, § 68081 [reviewing court may "render a decision . . . based upon an issue which was not proposed or briefed by any party" if it affords "the parties an opportunity to present their views on the matter through supplemental briefing"].)

Balboa's response has been to meet *Spray, Gould* somewhat head on. We say "somewhat" because the company does not argue that *Spray, Gould* was unsoundly reasoned as a matter of its internal logic. Balboa makes no attempt, for example, to argue that as a matter of first principle the violation of a regulation requiring disclosure of time limits should not estop an insurer from asserting those time limits as an affirmative defense to a suit on the claim. Nor does it suggest that the time limit disclosure regulation is beyond the Commissioner's authority. The company doesn't even argue that the regulation is unsound public policy. Rather, Balboa asserts that the *Spray, Gould* decision simply contravenes a higher court decision, *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 (*Moradi-Shalal*) [250 Cal.Rptr. 116, 758 P.2d 58]. Its fallback position is that even if *Spray, Gould* is consistent with *Moradi-Shalal*, it would be unfair to apply it retroactively.

■ *Moradi-Shalal* held that no private cause of action could be maintained under the Unfair Practices Act. (Ins. Code, § 790 et seq.) Balboa's theory is that under *Moradi-Shalal*, estoppel cannot be premised on a violation of the Unfair Practices Act, which Balboa appears to believe subsumes the disclosure regulation.[3]

The theory is untenable. The essential problem is that it assumes too broad a view of *Moradi-Shalal. Moradi-Shalal* demonstrated that as a matter of *statutory analysis*, it is wrong to conclude that the Unfair Practices Act was intended to include private causes of action. (See *Moradi-Shalal, supra*, 46 Cal.3d at pp. 297-301.) Indeed, the very language of the Unfair Practices Act indicates that a private cause of action is not within the act's purview: Subdivision (h), which introduces the litany of things that insurers shouldn't do, is framed in terms of many instances, not just a single case, thus signaling that the statute does not contemplate a private cause of action for a single instance of malfeasance: "The following are hereby defined as unfair methods of competition . . . in the business of insurance. [¶] . . . [¶] (h) Knowingly committing or performing *with such frequency as to indicate a general business practice* any of the following unfair claims settlement practices." (Ins. Code, § 790.03, italics added.)

To the degree that the decision rested on sound policy independent of what the Legislature intended, *Moradi-Shalal* was not directed at the Unfair

---

[3]We will assume, without deciding, the same for purposes of this opinion.

Practices Act generally—much less a regulation promulgated pursuant to its authority—but at what the court majority perceived to be the extremely bad idea, initially set forth in *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], of allowing third parties to sue insurers for not settling fast enough when liability was reasonably clear (cf. Ins. Code, § 790.03, subd. (h)(5)). (See *Moradi-Shalal, supra,* 46 Cal.3d at pp. 301-304). Much of the opinion is devoted to the analytical anomalies and adverse social and economic consequences of so-called *Royal Globe* actions (e.g., coercing inflated settlements) where a *second lawsuit* " 'hovers over most litigation involving an insured defendant.' " (*id.* at p. 302, quoting Allen, *Insurance Bad Faith Law: The Need for Legislative Intervention* (1982) 13 Pacific L.J. 833, 851.)

 But it does not follow that precluding someone who doesn't have a contract with an insurance company from suing that company because the company doesn't make a policy limits offer quickly enough (see *Moradi-Shalal, supra,* 46 Cal.3d at p. 295 [noting that Justice Richardson's dissent in *Royal Globe Ins. Co.* pointed out that "the duty to settle *runs to the insured*"]) means that an insurer cannot be estopped in a particular case for ignoring a directive of the Insurance Commissioner to notify all first party claimants of the one-year suit provision. In contrast with the language of the Unfair Practices Act, the suit provision, which is also derived from a statute (Ins. Code, § 2071) *is* focused on judicial, as distinct from administrative, processes. If there is to be any judicial recognition of the commissioner's time disclosure regulation, it would naturally be in the context of an estoppel to assert the one-year suit provision.

*Spray, Gould* itself addressed the problem of whether it was compatible with *Moradi-Shalal* by quoting language from pages 304 through 305 of the high court's decision, which clearly contemplates that there will be *some* judicial consequences for violation of the Unfair Practices Act, albeit not as drastic as allowing an independent cause of action: "Moreover, apart from administrative remedies, the courts retain jurisdiction to impose civil damages or other remedies against insurers in appropriate common law actions, based on such traditional theories as fraud, infliction of emotional distress, and (as to the insured) either breach of contract or breach of the implied covenant of good faith and fair dealing." (*Moradi-Shalal, supra,* 46 Cal.3d at pp. 304-305.) This language appeared as part of a demonstration that the world would not end if the Supreme Court overruled *Royal Globe Ins. Co. v. Superior Court, supra,* 23 Cal.3d 880, precisely because there were "other remedies" *in court*, as well as administratively, for violation of the Unfair Practices Act than a private right of action.

*Spray, Gould* called the lesser remedies alluded to in *Moradi-Shalal* "consequences short of an independent private right of action." (*Spray,*

*Gould, supra*, 71 Cal.App.4th at p. 1272.) Balboa does not tell us why estoppel should not be one of those remedies, which, if equity means anything, it surely is. Without belaboring the points made in *Spray, Gould*, it is enough to remark the sheer unseemliness of an insurer's being able to profit by flouting the regulations of the Insurance Commissioner in a context where it does *not* incur any "new or expanded" liability. (See *id.* at pp. 1270, fn. 10, 1271, 1274.) It is one thing not to allow a private cause of action; it is another not to allow an insurer to gain the benefit of a claimant's ignorance that a regulation is supposed to dispel.

The other half of Balboa's argument is that because *Spray, Gould* is a "new development" in the law, it should not be applied retroactively. Again the logic is flawed. Strictly speaking, *Spray, Gould* did not announce any new "rule" of law—the court simply put two and two together and divined what was already inherent in the nature of applicable legal principles in light of the commissioner's regulations. Those regulations have been effective since 1993 (before the Northridge earthquake, which gave rise to *Spray, Gould*), and the equitable principle of estoppel, which forms the heart of the court's decision, has been around seemingly forever.[4] In light of the regulation, we could just as easily reach the result we do today without any reference to the *Spray, Gould*.

A corollary to Balboa's newness argument is a reliance argument. The company says that "[f]ollowing *Moradi-Shalal*, it was not foreseeable that violations of section 790.03 would be used against insurers in civil actions, either as affirmative claims or in the context of the remedy of equitable estoppel." Again, the error in this formulation is that it rests on too much wishful thinking as regards *Moradi-Shalal*. In the section of *Moradi-Shalal* explaining the "other remedies" that remained after private cause of actions were eliminated, the *Moradi-Shalal* court went out of its way to specifically warn insurers not to violate the Unfair Practices Act: "We caution, however, that our decision is not an invitation to the insurance industry to commit the unfair practices proscribed by the Insurance Code." (*Moradi-Shalal, supra*, 46 Cal.3d at p. 304.)

"If you want to know the law and nothing else," wrote Oliver Wendall Holmes in his famous essay, *The Path of the Law*, "you must look at it as a bad man, who cares only for the material consequences which such knowledge enables him to predict . . . ." (See Golding, The Nature of Law: Readings in Legal Philosophy (Random House 1966) p. 178, reprinting

---

[4]See, e.g., Pitou, *Equitable Estoppel: Its Genesis, Development and Application in Government Contracting* (1990) 19 Pub. Contracting L.J. 606, 607 (estoppel's "origins can be traced back to at least the Twelfth Century in medieval England").

Holmes, *The Path of the Law* (1897) 10 Harv. L.Rev. 457.) In light of the warning given by Chief Justice Lucas writing for the court in *Moradi-Shalal*, no hypothetical "bad insurer"—consulting an oracle for accurate prophecies of what the courts would do—could have reasonably relied on *Moradi-Shalal* for permission to violate the Insurance Commissioner's regulation. That warning was part of an apologetic discourse by the court explaining that lesser remedies, including judicial remedies, would be available for violation of the Unfair Practices Act. Any reasonable insurer could have anticipated that no court would countenance the flouting of time limit disclosure regulations promulgated by the Insurance Commissioner in a context where the insurer was seeking the *benefit of its own wrong as an affirmative defense in litigation.*

Obviously then, it was error to grant the summary judgment based on the one-year suit provision given the present record. We express no opinion as to the nuances of any further proceedings regarding the statute of limitations issue.

Balboa argues that the judgment may be affirmed because Neufeld had no insurable interest in her ski lodge at the date of the loss, having given her son a deed for it in February 1995, two months before the loss. A copy of the recorded deed was part of the papers supporting a summary judgment motion brought by codefendant Ross Diversified Insurance Services, an insurance agency. However, in opposition to Ross's motion, Neufeld attached an *unrecorded* grant deed given back to her by her son the same day.

In this appeal, Balboa claims that because an unrecorded deed is unenforceable as to nonparties to the deed, it should be considered unenforceable against Balboa on the issue of the nonexistence of an insurable interest. Nonsense. The nature of an insurable interest ("that a contemplated peril might directly damnify the insured," Ins. Code, § 281) is independent of the enforceability *qua* enforceability of a property right against third parties. If she owned it, she had an insurable interest—and the deed back to her certainly indicates that she owned it.

While it is tempting, as a matter of elegantia juris (the wish for legal symmetry) to hold that Neufeld should be estopped to contend she has no insurable interest given that she did not record the deed just as Balboa is estopped to assert the one-year suit provision, estoppel in that context is not a matter that can be decided on this record on summary judgment. The whole story of Neufeld's machinations with her ski lodge, whatever transfers may have occurred, and the nature of the relationship between her, her son, and the property are at this point factual matters which await resolution by a trier of fact.

The judgment is reversed. Because of the interlocutory nature of a reversal of summary judgment, we do not award costs on this appeal now, but direct the trial judge to award those costs to the prevailing party at the end of this litigation.

Rylaarsdam, J., and O'Leary, J., concurred.